Filed 9/2/20  In re H.W. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re H.W., a Person Coming Under the Juvenile Court Law. | D076973 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. 519651) |
| Plaintiff and Respondent, | |
| v. | |
| B.W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marion F. Gaston, Judge.  Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant, B.W.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

B.W. (Mother) appeals the juvenile court's order denying her petition for modification under Welfare and Institutions Code section 388[1] seeking to return her minor daughter, H.W., to her care. Mother contends her circumstances had changed and returning H.W. to her care was in the child's best interests. We reject Mother's challenge and affirm the juvenile court's order.

FACTUAL AND PROCEDURAL BACKGROUND

This case began in January 2018, when H.W. was just under three months old. Early in the month, Mother and H.W.'s father, Robert G. (Father),[2] were at the pediatrician's office when Mother began screaming, banging on the walls and doors, yelling that Father hit her, and asking strangers to help her get away. Before staff at the clinic could intervene, Father was able to get Mother out of the office and bring the infant back for her appointment. The incident resulted in a referral to the child abuse hotline.

The following day, child protective services workers met with Father and the paternal grandmother. Father denied any domestic violence in his relationship with Mother, but reported that Mother had significant mental health issues, including a diagnosis of schizophrenia. The paternal grandmother reported that she had been the child's primary caregiver and that she was concerned about Mother's ability to care for H.W. because of her mental illness. The grandmother told the social worker that she did not know if Mother was using drugs and that Mother was not receiving any

---

[1]    Subsequent undesignated statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to the appeal and is discussed only where relevant to the issues raised by Mother.

psychiatric treatment. She also reported that Mother and Father did not have a stable living situation, and primarily stayed with her and in hotels. Father and paternal grandmother reported that they had not seen Mother since she left the pediatrician's office.

The following week, law enforcement contacted the San Diego County Health and Human Services Agency (Agency) after a violent altercation between Mother and Father in their car with H.W. in the back seat. The police report for the incident indicated the couple were fighting while Father was driving onto the freeway. Father punched Mother in the head multiple times and threatened her life before Mother jumped from the moving vehicle while it was on the on-ramp. After the police arrived, Father was arrested, Mother was taken to the hospital to treat her injuries, and H.W. was taken to the paternal grandmother's home.

During its investigation, the Agency discovered that both parents had extensive criminal records and that Mother had a history of drug abuse. Mother told the Agency's social workers that she had a diagnosis of schizophrenia but was not able to take medication because she was pregnant. Mother also reported she had used methamphetamine after H.W. was born. As a result of its investigation, on January 17, 2018, the Agency filed a petition on behalf of H.W. under section 300, subdivision (b)(1) alleging that H.W. was at risk of serious physical harm or illness as a result of the violent altercation that occurred between her parents in their car.

The detention hearing was held the day after the petition was filed. Mother and Father were both present and the court ordered counsel appointed for each, ordered H.W. detained in the home of an approved foster family or relative, and set the jurisdiction and disposition hearing for February 8, 2018.

Before the next hearing, H.W. was placed with a foster family and Mother agreed to participate in a domestic violence perpetrators group, medication management counseling, drug testing, and therapy. The Agency recommended that the court declare H.W. a dependent of the juvenile court and that custody be removed from her parents. At the jurisdiction and disposition hearing, both parents set the matter for trial, which was later scheduled for April 24, 2018. In its report for the trial, the Agency indicated the paternal grandmother was being evaluated for placement of H.W. and continued its recommendation for the court to take jurisdiction over H.W. and remove custody from her parents.

At the April 24, 2018 contested hearing, the court sustained the petition, finding the allegation true by clear and convincing evidence, removed H.W. from the parents' custody, and ordered the parents to comply with the Agency's case plan for reunification. The court also set the six-month review hearing. In June 2018, one of H.W.'s foster parents passed away and she was moved to a new foster placement. That placement lasted just a few days, and then H.W. was placed with her current foster family.

Initially during the review period, the parents were visiting with H.W. under the supervision of the paternal grandmother. However, on July 4, 2018, while H.W. was at the paternal grandmother's home visiting the paternal grandmother and other family members, both parents showed up unexpectedly. The parents and paternal grandmother engaged in a physical altercation in which Mother slapped Father, Father pushed Mother, and the paternal grandmother choked Mother, all in H.W.'s presence. As a result of the altercation, the paternal grandmother was prohibited from supervising further visits and her efforts to gain placement of H.W. were set back.

4

Throughout the six-month review period, Mother was inconsistent both in her visitation with H.W. and her participation in reunification services. After the paternal grandmother's visitation supervision ended and visits were scheduled at the Family Visitation Center, Mother's visitation was terminated because she missed three consecutive visits. The visitation was reinstated, but Mother continued to miss visits. Visit supervisors reported the visits that did occur were positive and H.W. was bonded to Mother. H.W.'s foster mother reported that when H.W. first came to her home "she would scream every 20-30 minutes after [they] put her to bed [and] wake up in a cold sweat shaking[, and] would stiffen her body when rocked or cuddled." The episodes decreased over time.

In addition to her inconsistent visitation, the family's social worker reported that Mother was not regularly attending therapy or taking medication prescribed for her mental health diagnosis. Mother told the social worker that she wanted to participate in a more intensive drug treatment program and in October she tested positive for methamphetamine, cocaine, and marijuana. Despite her lack of progress, for the six-month review hearing, the Agency recommended that Mother receive another six months of reunification services.

At the initial review hearing on October 22, 2018, H.W.'s counsel disagreed with the Agency's recommendation to continue reunification services and requested a trial on the issue of termination of services as a result of the parents' lack of progress in their reunification efforts. After several continuances, the court set a trial that coincided with the next review period. In its report in January 2019 for the trial settlement conference, the Agency reported that Mother continued to struggle in her reunification efforts. She did not visit H.W. or participate in services regularly. Mother's

parenting class facilitator reported concern that Mother had come to class under the influence of drugs. Mother also lashed out at the facilitator when she informed Mother that she had not yet completed the program. Mother visited H.W. only once and for only a few minutes because she was almost an hour late to the scheduled visit. Despite Mother's lack of progress, the Agency continued to recommend additional reunifications services.

Before the contested review hearing, then set for April 2019, the Agency filed an addendum report indicating that Mother had been arrested in January for car theft, and had been released from jail in late March to an in-patient treatment facility. Mother had not seen H.W. since January 2, 2019. When she was interviewed by the Agency's social worker on April 9, 2019 about her arrest, Mother said that "everyone was treating me like shit, so I started using drugs and was living on the streets. I stole a car so that the police could pick me up." Mother reported that since her incarceration, she had been on medication for her schizophrenia consistently and felt good. As a result of Mother's incarceration and failure to participate in reunification services, the Agency changed its position and recommended that reunification services be terminated and that the court set a permanency planning hearing for H.W. under section 366.26.

In its April 23, 2019 report in advance of the continued six-month review hearing and for the 12-month review hearing, the Agency stated that Mother was continuing her in-patient treatment and had two positive visits with H.W. H.W. was doing well in her foster placement and was bonded to her caregivers. The Agency stated it would be detrimental to return H.W. to Mother's care because of Mother's lack of effort to participate in reunification services and inconsistent visitation with H.W. in the year leading up to her incarceration. The Agency noted that H.W., then a year and a half old,

6

needed stability and should not be placed in an environment where she could be exposed to more domestic violence and turmoil.

The review hearing was again continued, to June 7, 2019. Because of the delay, the contested 6-month and 12-month review hearings were combined to that date. In its final report before the hearing, the Agency stated that Mother continued to do well with her recovery program and had not had a positive drug test since she was released from jail. Mother had also resumed regular visitation with H.W. The visits were going well, although H.W. was somewhat resistant to engage with Mother. The Agency's report applauded Mother's recent efforts to improve her life, but the Agency continued to recommend the termination of reunification services because Mother's progress was so recent. The Agency noted that Mother had not "demonstrate[d] the ability to stabilize her mental health long enough to be certain that [she] has the ability to safely care for" H.W.

At the combined review hearing on June 7, 2019, Mother sought placement of H.W. or in the alternative additional reunification services and increased visitation. At the hearing, the court received the Agency's reports into evidence. Mother introduced a certificate of completion for a parenting program and other documentation concerning her progress. She also read a letter she wrote to the court expressing remorse for her prior behavior, the steps she had taken to get her life on track, and explaining that she was dedicated to her recovery and to being a stable parent for H.W. Counsel for the Agency and H.W. praised Mother's new-found success, but asserted that termination of reunification services remained appropriate in light of the length of time that had passed since the proceeding was initiated. Agency counsel noted that the end of the 18-month review period was approaching on July 18, 2019, and that in order to continue services to that date, Mother

7

would need to show a probability that H.W. could be safely returned to her care, a burden Mother could not meet.

At the conclusion of argument, the juvenile court commended Mother for her sobriety and new commitment to H.W. The court found, however, that Mother had not made sufficient progress towards mitigating the causes of H.W.'s removal from her care to warrant continued services and that it was unlikely she could regain custody of H.W. by the end of 18-month review period. The court noted that had Mother's recent progress occurred earlier in the proceeding, its findings would be different. The juvenile court stated its additional finding that Mother had not been consistent in her visitation with H.W. and that the Agency had offered reasonable services to the parents. The court then terminated reunification services and scheduled a permanency planning hearing under section 366.26.[3]

In the subsequent months, Mother continued to progress with her treatment and remained committed to her sobriety. She obtained placement in another highly structured residential treatment program and visited H.W. several times. However, a missed scheduled visitation resulted in the termination of her referral for the visitation center, and Mother's subsequent visits took place during the paternal grandmother's scheduled visitation. The visits Mother did have with H.W. were positive.

In the report for the permanency planning hearing, the Agency's social worker opined that H.W. was both generally and specifically adoptable, as her foster parents were committed to adoption. H.W. was almost two years old at the time of the report and was thriving in her placement. H.W.'s foster

---

[3] Mother and Father each filed a notice of intent to appeal seeking to challenge the juvenile court's findings and orders. This court dismissed the case after counsel for the parents indicated there were no viable issues for review.

parents also expressed their intention to facilitate a relationship with Mother and other biological relatives if the interactions were positive.

For the permanency planning hearing, the Agency recommended the termination of parental rights in order to free H.W. for adoption. The Agency's social worker opined that adoption was the most appropriate permanent plan for H.W. and that the benefits of adoption outweighed the benefits of H.W.'s relationship with either parent. The reporting social worker also opined that neither parent had a parental relationship with H.W.

After the Agency's report was submitted and before the hearing, on September 27, 2019, Mother filed a petition for modification under section 388 seeking to set aside the court's prior order terminating reunification services and setting the permanency planning hearing. As changed circumstances, Mother pointed to her completion of the treatment program at her first residential placement after being released from jail, her recent transition to sober living housing (where H.W. could also live) with continued supported services, and her eight months of sobriety and stability in the treatment of her mental health diagnosis. Mother asked the court to place H.W. with her with family maintenance services. Attached to the mother's petition was verification of her participation in the various programs.[4]

The matter came before the court for a section 366.26 hearing on October 2, 2019. In addition to pursuing her modification petition, Mother also objected to the Agency's recommendation to terminate her parental rights and requested a trial on that issue. The juvenile court found Mother had made a prima facie showing under section 388 and was entitled to a

_____

[4] Around the same time, the paternal grandmother, who had not yet been approved as a relative caregiver for H.W., also filed a section 388 seeking placement of H.W. under section 361.3. Her petition was considered at the same time as Mother's section 388 petition.

hearing on her petition, which should precede the section 366.26 determination. The court scheduled the case for a hearing on Mother's petition for December 3-4, 2019.

In its report for the contested hearing, the Agency noted that Mother had continued working with her service providers and on her sobriety. She also continued her visitation with H.W., which was positive. H.W. recognized Mother and was playful and called her "mama." The reporting social worker noted that Mother and H.W.'s extended family members loved her, and that although they were well-meaning, they suffered from "significant generational trauma including loss, domestic violence, mental illness, and substance use, which has impeded the adults in [H.W.'s] family to be able to care for her." The social worker stated that although Mother had made significant progress over the recent months, given the severity of her mental health and substance abuse history, there had not been an adequate time of stability in her life to support a finding of changed circumstances. The social worker recommended denial of the petition so that H.W. could have the security that adoption would afford her.

At the hearing on Mother's modification petition, the court accepted the Agency's reports into evidence, as well as documentation introduced by Mother concerning the services and treatment she received after her release from jail. Mother's therapist testified about her background and efforts at recovery throughout the proceeding. Mother also testified about her long history of substance abuse beginning when she was 16, and about her recent recovery. Finally, the Agency's social worker who prepared the reports for the final review hearing and in response to Mother's petition testified. The social worker opined that it would not be in H.W.'s best interest to remove her from her current caregivers and place her with Mother.

After the conclusion of evidence and argument by counsel, the juvenile court denied Mother's petition for modification. The court emphasized the fact that a full year had passed after the proceeding was initiated before Mother made any progress in her reunification efforts. The court stated that Mother's success was to be celebrated, but that her recent progress could not overcome the fact that H.W. was over two years old and had been out of the care of Mother since her second month of life. The court found that Mother's nine months of stability was praiseworthy, but not sufficient evidence of changed circumstances. Finally, the court found that even if there were changed circumstances, Mother had not shown that reversing its prior order terminating Mother's services was in H.W.'s best interests.[5]

Mother timely appealed from the denial of her petition for modification.

## DISCUSSION

Mother's appeal is, in essence, a request for this court to reassess the evidence before the juvenile court. Mother argues the record shows that in the three months between the termination of her reunification services and the hearing on her petition for modification her circumstances had changed. She also asserts the factors the juvenile court must examine to determine if a proposed modification is in the minor's best interests weighed heavily in her favor. While we are sympathetic to Mother's desire for another chance at reunification, the limits of our review require affirmance in this case.

---

[5]    After denying Mother's petition, at the request of the paternal grandmother's counsel, the court continued the hearing on the paternal grandmother's petition for modification. The court also continued the permanency planning hearing and set both for January 3, 2020.

11

## I

Under section 388, a party may petition the court to change, modify or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, there is a change of circumstances or new evidence, and the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) Whether a previous court order should be modified and a change would be in the child's best interests are questions within the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The order will not be disturbed on appeal unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our decision for that of the juvenile court. (*In re Stephanie M.*, at pp. 318-319.) In ruling on a modification petition, the court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

## II

With respect to the changed circumstance prong, the juvenile court's finding that Mother's "recent sobriety reflects 'changing,' not changed, circumstances" was supported by the evidence. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Mother's recent dedication to her sobriety and mental health stability are to be applauded, but at the time of the hearing on her petition for modification, she was in a relatively early stage of her recovery. (See, e.g., *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 [" 'It is the nature of addiction that one must be "clean" for a much longer period than 120 days to show real reform.' "]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415,

423-424 [200 days of sobriety not enough].)  At that time, Mother was less than nine months from her release from jail, and the evidence showed she was still addressing significant mental illness and a long-standing substance abuse problem.  Of particular note, and as the Agency points out in its brief, Mother had no track record of living on her own without significant intervention and support by her service providers.  Mother's "completion of a drug treatment program, at this late a date, though commendable, is not a substantial change of circumstances." (*In re Ernesto R., supra*, 230 Cal.App.4th at p. 223.)

Even if there were a change in circumstances, however, Mother has not established the juvenile court erred by finding that reinstating reunification services was not in H.W.'s best interests.  "The factors to be considered in evaluating the child's best interests under section 388 are:  (1) the seriousness of the problem that led to the dependency and the reason for any continuation of that problem; (2) the strength of the child's bond with his or her new caretakers compared with the strength of the child's bond with the parent; and (3) the degree to which the problem leading to the dependency may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Ernesto R., supra*, 230 Cal.App.4th at p. 224, citing *In re Kimberly F., supra*, 56 Cal.App.4th at pp. 531-532.)

The evidence before the juvenile court supported its findings under these factors.  First, the problems that led to this dependency were severe, including dangerous domestic violence in the presence of H.W. when she was an infant, and Mother's significant substance abuse and untreated mental illness.  Second, H.W. was bonded to her caregivers and thriving in their home.  While she shared a positive relationship with Mother, there was no evidence that H.W. would experience any detriment if not placed in Mother's

13

care. Rather, the social worker opined that Mother had not formed a parental relationship with H.W. and that H.W. was forming such a relationship with her foster parents, who were committed to adoption.

Finally, while Mother had made significant progress in ameliorating her mental health and substance abuse issues, and had engaged in domestic violence services, these efforts did not begin until over a year after H.W. was removed from her care. The juvenile court's conclusion that Mother's progress was too late, and that continued delay of stabilizing H.W.'s life was not in her best interest, was well within the bounds of its discretion.

Critically, after the termination of reunification services, "the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child." (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.) Where, as here, " 'custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' " (*Ibid.*) Sadly, "[c]hildhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

The record shows that here, "the juvenile court properly evaluated the evidence, and placing special weight on the child's need for stability, as was appropriate at that stage of the proceedings, determined that [Mother] had

not carried [her] burden of proof."[6] (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)  This determination was not an abuse of discretion.

DISPOSITION

The order is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.

---

[6]     This case is distinguishable from the recently published case of *In re J.M.* (2020) 50 Cal.App.5th 833, which reversed the denial of the parent's petition for modification seeking reinstatement of reunification services.  In *J.M.*, the single basis for the dependency was domestic violence between the minor's parents.  The evidence before the juvenile court showed the mother had entirely ameliorated that issue because she had "not been in contact with Father for over a year, had completed all required domestic violence training, and nothing suggested Mother was or had been in another potentially violent or abusive relationship." (*Id.* at p. 846)  Among other issues identified by the juvenile court that were not substantiated by the record evidence, the juvenile court's best interest analysis improperly focused on an area of concern that was not related to the original grounds for removal—the mother's lack of special training in dealing with her son's special needs. (*Id.* at p. 849.)  In reversing the juvenile court order, the Court of Appeal also noted that the mother had addressed "the myriad of other concerns— completely unrelated to any risk of domestic violence—that the [juvenile] court raised in terminating her reunification services." (*Id.* at p. 846.)  Unlike the parent in *J.M.*, Mother's challenge to the earlier termination of her parental rights was dismissed, and there are no flaws in the juvenile court's best interest analysis akin to those found in *J.M.*

15